**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

|  |  |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | CIVIL ACTION NO: |
| Plaintiff, | Hon._____ |
| v. | |
| MINTCO LLC, RICHARD Q. ZIMMERMAN, and STUART RUBIN, | |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND
PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

The United States Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its attorneys, hereby alleges as follows:

### I.    SUMMARY

1.      From July 16, 2011, through the present (the "Relevant Period"), Defendant Mintco LLC ("Mintco"), by and through its agents, officers, or persons acting within their employment, agency, or office with Mintco, including its Chief Executive Officer, Stuart Rubin ("Rubin") and President, Richard Q. Zimmerman ("Zimmerman") (collectively, "Defendants"), purported to sell "physical" commodities, including gold, silver, platinum, and palladium, in storage ("retail commodity transactions"), often on a leveraged, margined, or financed basis ("financed transactions"), but also on a non-financed or "fully-paid" basis, to retail customers who were not eligible contract participants ("ECPs").  In fact, the financed transactions did not

1

result in actual delivery of metal to customers and Defendants have thus offered to enter into, accepted orders for, entered into, executed, and confirmed unlawful off-exchange precious metals transactions and failed to register as a futures commission merchant. In addition, Defendants have defrauded retail customers by misrepresenting and omitting to disclose material facts regarding: the past performance of both the financed and fully paid transactions they marketed; the break-even point for the financed transactions they marketed; and the relationship between Mintco and retail customers in the financed and fully-paid transactions.

2.      Following the enactment of Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or "Dodd Frank"), Public Law 111-203, 124 Stat. 1376 (2010), effective July 16, 2011, retail commodity transactions must be executed on a regulated commodities exchange pursuant to Section 4(a) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 6(a) (2012).

3.      Transactions that result in actual delivery of precious metals to customers within 28 days are excepted from this requirement (the "28-day exception"). To make actual delivery, the seller in a financed transaction must secure and deliver the contracted amount of physical metal for each customer within 28 days of its acceptance of the customer's order. For actual delivery to result, the customer or the customer's agent must have possession and control of the physical metal.

4.      The financed transactions Mintco markets to retail customers do not result in actual delivery. Mintco does not itself acquire, deliver and store any financed metal on behalf of any of its customers. Instead, it contracts with a third party, Worth Group Inc. ("Worth"), to manage its exposure. Worth, in turn, allegedly "delivers" the financed precious metal that the retail customer purchases. Worth maintains a "master" account and customer sub-accounts at

2

depositories with whom it has contracted to hold metal. Worth is the signatory on both the master accounts and the sub-accounts, and neither Mintco nor the retail customers have a contractual relationship with the depositories. For financed transactions, Worth purports to deliver to retail customers by "allocating" metal from the master account to the customer sub-accounts. These allocations are book entries; there are no physical transfers of metal. Worth's depositories maintain possession of the allocated metal, and Worth maintains control of the metal, so that actual delivery to the retail customers does not occur. Because the financed transactions do not result in actual delivery, they are illegal, off-exchange transactions.

5.     By virtue of this conduct and the conduct further described herein, Defendants Mintco, Rubin, and Zimmerman have engaged, are engaging, or are about to engage in conduct in violation of Sections 4(a), 4b(a)(2)(A),(C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A),(C), 6d, 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2014).

6.     Mintco's employees and agents, including Defendants Rubin and Zimmerman, committed the acts and omissions alleged herein within the course and scope of their employment, agency or office with Mintco. Therefore, Mintco is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2014), as principal for the violative acts and omissions of Mintco's employees and agents, including Rubin and Zimmerman. Rubin and Zimmerman are also liable for these violations as controlling persons of Mintco pursuant to Section 13(b), 7 U.S.C. § 13(c)(b), because they failed to act in good faith or knowingly induced the acts constituting Mintco's violations.

7.     Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint, or in similar acts and practices.

8.     The CFTC accordingly brings this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful practices and to compel their compliance with the CEA and Regulations.  In addition, the CFTC seeks restitution, rescission, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

## II.     JURISDICTION AND VENUE

9.     Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the CEA or any rule, regulation, or order thereunder.

10.     With respect to Defendants' financed transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D).

11.     With respect to Defendants' non-financed fully-paid transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1).

12.     Venue properly lies with the Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## III.     PARTIES

13.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for administering

and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§1.1 *et seq.* (2014).

14.     **Mintco LLC** ("Mintco") is a Florida corporation, incorporated on July 14, 2011, with its principal place of business formerly in Deerfield Beach, Florida and more recently in Delray Beach, Florida. Mintco is 100% owned by its two principals, Rubin and Zimmerman. In its solicitation materials, Mintco characterizes itself as "a market maker and dealer in precious metals." Mintco, using websites and telemarketers, solicited retail customers to invest in leveraged, margined, physical, financed or fully paid precious metals transactions. Mintco has never been registered with the Commission in any capacity.

15.     **Stuart Rubin** resides in Fort Lauderdale, Florida. He is the Chief Executive Officer, a principal, and 50% owner of Mintco. Rubin was registered as an associated person with the Commission while employed by various introducing brokers between 1984 and 2006. He is not currently registered. On April 11, 2003, Rubin was personally sanctioned by the National Futures Association ("NFA") for violation of NFA Rule C.R.2-9, which requires that "[e]ach member shall diligently supervise its employees and agents in the conduct of their commodity futures activities for or on behalf of the Member." At that time, Rubin was fined $445,000, jointly and severally with the company he operated.

16.     **Richard Zimmerman** resides in Wellington, Florida. He is the President, a principal, and 50% owner of Mintco. He is currently registered with the Commission as an associated person of a registered introducing broker. On July 14, 2006, Zimmerman was sanctioned by the NFA for violation of NFA Rule C.R.2-2(a), which provided that NFA members shall not "[c]heat, defraud, or deceive, or attempt to cheat, defraud or deceive, any commodity futures customer," and BFA Rule 2-29(a)(1), which provided that NFA members

5

shall not "make any communication with the public which operates as a fraud or deceit." At that time, Zimmerman was fined $5,000, suspended from membership for three months, and required to tape record all customer calls for six months.

## IV.   OTHER RELEVANT ENTITIES

17.   **Worth Group Inc.** ("Worth") is a Florida corporation formed in June 2002 that has previously operated under the names of Wilshire Capital Management Corp. and Worth Bullion Group Inc. Worth describes itself as "a Florida-based precious metals wholesaler [that] might also be described as a dealer or broker of precious metals." Worth's business office is located at 3900 Military Trail, Ste. 500, Jupiter, Florida, 33458. Worth has never been registered with the Commission in any capacity.

18.   Plaintiff CFTC brought an action against Worth in the Southern District of Florida, *CFTC v. Worth Group, Inc., et al.*, Case No. 13-cv-80796-KLR (S.D. Fla., complaint filed August 13, 2013), alleging, inter alia, that Worth defrauded retail precious metals customers and engaged in illegal, off-exchange leveraged commodity transactions with retail customers. On January 23, 2014, the Court entered a Consent Order of Preliminary Injunction and Other Ancillary Relief (ECF No. 61) that, among other relief, enjoins Worth from violating certain provisions of the Act. On April 14, 2014, the Court denied Worth's motion to dismiss (ECF No. 79), finding that the CFTC had jurisdiction over the alleged transactions and that the complaint, as filed, stated a claim for fraud. On July 29, 2015, the Court denied the parties' cross-motions for summary judgment (ECF No. 181).

## V.   STATUTORY BACKGROUND

19.   Effective July 16, 2011, the Dodd-Frank Act broadened the scope of the CFTC's jurisdiction to include financed commodity transactions with retail customers. The new Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D), applies, subject to certain exceptions, to "any

6

agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a person who is not an ECP "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," with respect to conduct occurring on or after July 16, 2011.

20.     Under Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), such retail commodity transactions are subject to Sections 4(a), 4(b), and 4b of the CEA, 7 U.S.C. §§ 6(a), 6(b), and 6b "as if" they are a contract of sale of a commodity for future delivery.  As a result, these transactions must be executed on an exchange and are subject to anti-fraud provisions as set forth in Sections 4(a) and 4b of the CEA, 7 U.S.C. §§ 6(a), 6b.

21.     The CEA defines an ECP, in relevant part, as an individual who has funds invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  Section 1a(18)(xi) of the CEA, 7 U.S.C. § 1a (18)(xi).

22.     Section 4(a) of the CEA, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

23.     Section 4b(a)(2) of the CEA, 7 U.S.C. § 6(a)(2), in relevant part, makes it unlawful for any person, in or in connection with any order to make, or the making of, any

contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market: (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for, on behalf of, or with the other person.

24.     Effective August 15, 2011, Section 753 of the Dodd Frank Act amended Section 6(c) of the CEA, 7 U.S.C. § 9(1), and broadened the CFTC's anti-fraud jurisdiction as set out in Regulation 180.1, 17 C.F.R. § 180.1.

25.     Section 6(c)(1) of the CEA, in relevant part, makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Regulation 180.1.

26.     Effective August 15, 2011, Regulation 180.1, in relevant part, makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

## VI.   DEFENDANT'S UNLAWFUL SCHEME

### A. Mintco's Business Activities

#### 1. Basic Nature of Mintco's Business

27.     Mintco holds itself out as a market maker and dealer in precious metals. The "Welcome to Mintco" section of Mintco's website, www.mintco.com, states, in relevant part, "[a]t Mintco we specialize in helping investors diversify a percentage of their portfolio into hard assets such as gold, silver, and platinum, investment strategies intended to maximize returns through the outright purchase of or through financed programs."

28.     Mintco markets stored precious metals to retail customers on both a fully-paid basis, in which customers pay the full purchase price in return for precious metals, as well as on a financed basis, in which customers pay a portion of the purchase price and finance the remainder through Worth.

29.     Mintco, by and through its employees and agents, including Defendants Rubin and Zimmerman, solicited customers through telemarketing and Mintco's website, to engage in leveraged, margined, or financed precious metals transactions as well as fully paid precious metal transactions.

30.     In financed transactions, customers pay a portion of the purchase price of the metal, which Mintco passes on to Worth, and Worth provides financing directly to the customers by purportedly loaning them the unpaid portion of the purchase price. The customer is then charged interest on that loan.

31.     None of the precious metals transactions Mintco markets to retail customers are executed on or subject to the rules of a board of trade or exchange that has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for precious metals.

32.     Mintco serves as a soliciting firm ("introducer" or "retailer") that performs sales functions and introduces customers to Worth. Mintco does not generally buy or sell any financed or stored metal itself. Instead, it merely accepts customer orders and funds, charges a commission on the funds, and forwards the orders and funds to Worth or other providers of metal.

33.     The retail customers Mintco deals with consist mostly of individual retail investors with aggregate discretionary investments of less than $5 million who use their Mintco accounts for speculative purposes, rather than because they are involved in a line of business related to precious metals, and are not ECPs.

### 2. Customer Account Agreement

34.     Mintco enters into an account agreement with financed retail customers ("the Account Agreement") which governs the terms of the relationship and the purchase and sale of precious metals by retail customers. The Account Agreement provided to customers is approximately fourteen pages long, printed in ten point font or smaller, and includes in excess of 50 numbered paragraphs. It provides information on the nature of the transactions, the various fees associated with the transactions, and information on financing.

35.     The customer does not enter into the Account Agreement with Worth – the ultimate supplier of the metal. Instead, customers enter into the Account Agreement with Mintco and then Mintco enters into a virtually identical version of the Account Agreement with Worth.

36.     As Mintco's Chief Executive Officer and President, respectively, and as the two people primarily responsible for managing Mintco, Rubin and Zimmerman are responsible for the terms and representations contained in the Account Agreement that Mintco executes with retail customers.

### 3.  Order Placement and Transaction Completion

37.     Retail customers place orders to buy or sell metals by contacting Mintco.  After a customer communicates an order to Mintco, Mintco contacts Worth to complete the customer's transaction.  Mintco does so by entering the transaction into Worth's data system or submitting it to Worth over the phone or by fax.

38.     The customer's transaction or contract to buy or purchase metal is complete no later than the point at which Worth enters the transaction into its data system to finalize it and issues a confirmation.

### 4.  The Structure of Mintco's Financed Transactions

39.     In a common financed transaction, customers leverage their transactions at 2.5 to 1, meaning, for example, that a customer could deposit $10,000 to purchase $25,000 worth of metal.  In an initial customer transaction, the customer submits his deposit, in this example the $10,000, to Mintco.

40.     Between July 2011 and January 2013, upon receipt of customer funds, Mintco extracted an up-front commission of between zero and fifteen percent of the full value of the metal purchased for its role in introducing the customer to Worth.  Mintco's commission was initially taken (when it was set at between zero and fifteen percent of the full value of the metal purchased) not as a percentage of a customer's initial deposit (*i.e.*, $10,000), but instead as a percentage of the leveraged purchase amount (*i.e.*, $25,000, assuming 2.5 to 1 leverage), also known as the "total metal value".  So, when a customer deposited $10,000 as in the example above, they were immediately charged an up-front commission by Mintco of $3,750, which represented 15% of the total metal purchased ($25,000) or 37.5% of their initial deposit ($10,000).

11

41.     The remaining funds, in this example, $6,250, would then be submitted to Worth to purchase the $25,000 of metal for the customer's account. Crediting these funds against the purchase amount, the remaining $18,750 is then considered the customer's "loan balance" at Worth.

42.     From January 2013 to November 2014, rather than an up-front commission, Mintco charged its own premium or "mark up" of between four and ten percent on the price of the metal purchased. This percentage was calculated based on the purchase price of the metal, quoted by Worth, and then added into the ultimate purchase price paid by the customer. The difference between the customer's initial down payment and the total value of the metal purchased was considered the loan balance.

43.     New customers were also generally charged a $200 account opening fee, which was immediately added to the customer's loan balance.

44.     The bulk of Worth's revenues then come from: (1) charging a spread of 3-5% above what Worth represented to be the current spot market price of the metal; (2) charging customers storage fees for the metals in their accounts; and (3) charging customers interest on their "loan balance." Worth sets its interest charge at 4.5% above the prime rate, which it has recently charged at an annual rate of 7.75%. Even though Worth often does not have metal to sell to customers at the time of their transaction and only secures the metal at some later time, Worth begins charging customers interest immediately following its acceptance of the customer transaction.

45.     The effect of these interest and storage charges is that the equity (or "margin") in a customer account – the value of a customer's metal less their "loan balance" at Worth – is constantly eroded by additions to the customer's loan balance.

46.     During the period Mintco was charging its up-front commission of up to 15%,
Worth allowed it to charge and keep an additional spread or mark up of up to 1% of the price of
the metal purchased beyond that already charged by Worth.  With respect to financed customers,
Worth also allows Mintco to charge up to an additional 2% interest beyond that charged by
Worth, bringing potential customer interest charges to as much as  9.75%.

47.     These various spread and interest charges combine to quickly reduce the equity in
customer accounts, and to place the viability of the customer account at risk.  When the equity in
a customer account is reduced to 10% (of the total value of the metal), customers are deemed
subject to an equity call, and must send in additional funds to supplement the equity in the
account.  If they are unable to do so, Worth liquidates the customer account at a loss, which is
done by the end of the day on which the account fell below the 10% equity threshold, without the
customer's permission.  With certain very limited exceptions, Worth does not provide retail
customers with any formal notice prior to liquidating their account.

48.     The various charges imposed on customer accounts also mean that the price of
precious metals must appreciate tremendously just for the customer to break even on their
investment.  The price that precious metals must appreciate to in order to cover costs over a
certain period is termed the "break-even point."  For instance, assuming a customer buys
leveraged precious metal at a leverage percentage of 2.5 to 1 and is assessed an up-front Mintco
commission of 15%, total Worth and Mintco interest charges of 9.75%, a total Worth and Mintco
purchase price spread of 4%, and the typically assessed monthly storage fees of $.25 per ounce, a
customer purchasing metals at a market price of $1600 per ounce would break even on their
investment only if the metals reached a market price of $2039.58 by the end of the first year of
the investment, an increase of 23.5%.

13

49.     Thus, due to the high fees, finance charges and commissions and changes in metals prices, the retail customers rarely broke even on their investments, let alone earned a profit, because much of their principal investment was consumed by costs.  During the period following the effective date of Dodd-Frank, over eighty percent of retail customers who purchased metal in storage through Mintco failed to earn enough on their investments to cover the costs associated with their purchases and earn a profit.

50.     The mechanics of the fully-paid stored transactions Mintco marketed work similarly to the financed transactions except that customers do not use financing to make the initial metals purchase and therefore are assessed the commission, account opening fee, and storage costs but not the same interest costs associated with leveraged purchases.

**B.  Mintco's Failure to Make Actual Delivery to Retail Financed Precious Metal Customers.**

51.     Worth maintained physical metals inventories at two depositories, where it held its unallocated metals in a master account in Worth's name.  Worth is the signatory on this account.

52.     When a financed retail customer enters into a transaction to purchase metal through Mintco, upon notice from Mintco, Worth sends instructions to the depository to "allocate" the appropriate type and quantity of metal from Worth's master account to a "sub-account" in the customer's name.  The allocation is a book entry, where the depository adjusts its records to reflect a paper change in the quantity of metals in Worth's master account and the customer sub-account; the physical metal resides in the same vault as when it was unallocated. The depository, who is Worth's agent, maintains possession of the physical metal after the allocation, not the retail customer.

14

53.    The retail customer receives a piece of paper from Worth with the words, "Commodity Title Transfer Notice," on it.  However, the rights conveyed by the document are very limited.  The document expressly prohibits the retail customer from granting a security interest in, or conveying any right with respect to "their" metal to anyone except Worth after they receive this document.

54.    Worth is also the signatory for the depository agreements related to the customer sub-accounts.  Neither Mintco, nor the retail customer has a contractual relationship with the depository.  In fact, the Sub-Account and Pool Sub-Account Agreements Worth maintained with at least one depository contain identical language disclaiming any relationship with the retail customer: "[Worth] acknowledges that [Depository] has no contractual relationship with [Worth's] customers and [Worth] is solely responsible for maintaining its customer relationships."  The significance is twofold: (1) the allocation between the master account and the customer sub-account is in reality an allocation from one Worth account to another; and (2) at the sub-account level, the depository remains an agent of Worth, not Mintco or the retail customer.

55.    Worth maintains complete control over the customer sub-account, both before and after any allocation.  Under the agreements with both depositories, only Worth has the ability to transfer physical metal to and from a customer sub-account.  The customer has no control over any metals in the customer sub-account at the depository.

56.    Because the retail customer never has possession and control of the metal in this process, Mintco has not made actual delivery of precious metals to the retail customers.

57.    During the Relevant Period, none of the leveraged, margined, or financed precious metals transactions entered into with, or offered to, the retail customers by Defendants

were conducted on or subject to the rules of any board of trade, exchange, contract market, or derivatives transaction execution facility.

58.    During the Relevant Period, Defendants Rubin and Zimmerman either personally solicited customers for Mintco, offered or accepted Mintco customer orders in connection with leveraged, margined, or financed precious metals transactions, or committed the acts described herein within the course and scope of their employment at, or agency with Mintco.

59.    During the Relevant Period, Defendants Rubin and Zimmerman were the principals of Mintco and the signatories on Mintco bank accounts.  Rubin and Zimmerman each had authority to hire and fire Mintco employees and sign contracts on behalf of Mintco.  They participated in creating Mintco's marketing strategy, and placed and confirmed customer orders for precious metals.

### C. Mintco's Fraudulent or Deceptive Misrepresentations and Omissions to Customers

60.    During the Relevant Period, Defendants fraudulently and deceptively misrepresented or omitted to disclose material facts to potential and existing retail customers which included: misrepresenting the nature of the relationship between Mintco and retail customers in financed and fully-paid stored metal transactions, misrepresenting the break-even price of investments in precious metal to customers in financed transactions, and omitting to inform customers in financed and fully-paid stored precious metal transactions that in excess of 80% of the retail customers who purchased metal in storage, failed to cover their costs and earn a profit on their investments.

#### 1. Misrepresentation of Relationship Between Mintco and the Retail Customers in Financed and Fully-Paid Transactions for Stored Precious Metal

61.    Defendants made material oral and written fraudulent or deceptive misrepresentations to potential and existing customers that Mintco would act in their best interest

and as customers' agent or representative. The standard solicitation materials Mintco sent to customers included an introductory letter from a Mintco Account Executive which prominently featured the statement, "Mintco, LLC is an independent Introducing Precious Metals Broker that will act as *your representative* in the area of purchasing those metals." (emphasis added) This statement was also part of Mintco telephone scripts distributed to Mintco brokers, intended to be communicated verbally to potential customers during solicitation calls.

62.     Mintco's September 2011 solicitation scripts include the fraudulent statement "Your Account Executive will work diligently with you to establish the most beneficial Precious Metals portfolio for your account."

63.     During the Summer of 2012, Mintco mailed a document to customers titled "Mintco Palladium Report Summer of 2012," in which Mintco made the following fraudulent and deceptive misrepresentation regarding the formation of an agency relationship with its customers, stating:

> Your down payment is approximately 27% of the total metal value and Mintco LLC will *act on your behalf as your agent* and arrange for financing and storage of your metal through our counterparty. (Emphasis added)

64.     In 2013, Mintco mailed a second document to customers titled "Mintco Palladium Report 2013," in which Mintco again made a similarly fraudulent and deceptive misrepresentation regarding the formation of an agency relationship with its customers, stating:

> Your down payment is approximately 25% of the total metal value and Mintco, LLC will *act on your behalf as your agent* and arrange for financing and storage of your metal through our counterparty. (emphasis added)

65.     Mintco's website, on an introductory page titled "Welcome to Mintco", further stated, "[w]e always place the best interests of our clients above our own personal and business interests."

17

66.     These misrepresentations by Mintco, intended to create the impression that Mintco would be acting in customers' best interest or as their agent, were false and deceptive, and Defendants knew that these representations were false as they directly conflicted with the description of the customer relationship as disclosed in small print in Mintco's account agreement.   Paragraph 4.2 of the Account Agreement, titled *Role of Mintco*, states that "[n]either Mintco nor any of its employees acts as an agent or fiduciary for any of retail customers." Paragraph 11 of the Account Agreement, titled *Customer Acknowledgement of Risks*, further provides, *inter alia*, that:

> Mintco and its employees and suppliers are not agents for Customer and owe no fiduciary duty to Customer.
>
> ***
>
> Mintco and its representatives earn income based upon the volume and type of transactions with customers.  In the process of selling precious metals to, and buying precious metals from, you, you should assume that the interests of Mintco and its representatives conflict with your interests.

67.     These misrepresentations were material since a reasonable customer would want to know whether Mintco was acting in customers' interest when Mintco was making investment recommendations.

### 2.  Misrepresentation of Break-Even Point on Investments in Financed Transactions for Stored Metal

68.     Beginning in October 2013, Defendants also made material fraudulent and deceptive oral misrepresentations to customers at the time financed metals were purchased regarding the break-even point – *i.e.*, how much the investment in precious metal would have to appreciate to cover costs and earn a profit – by informing customers during tape-recorded telephone conversations that the break-even price was "approximately the same as the purchase price."

69.     These statements were false, and Mintco sales representatives knew them to be false or acted in reckless disregard of the truth because, in reality, the customers' break-even prices were materially higher than the purchase prices in financed transactions because of the significant costs and fees associated with the transactions. In fact, few if any customers' investments were able to cover their costs and earn a profit.

70.     This misrepresentation was clearly material in that a reasonable customer would certainly want to know that the break-even price on his or her investment was materially different from and significantly higher than the purchase price.

### 3.   Failure to Disclose that Over Eighty Percent of Retail Customers Who Purchased Financed and Fully Paid Precious Metal in Storage Failed to Cover the Costs of their Investment and Lost Money

71.     Defendants also recklessly omitted to disclose to potential customers that over 80% of the retail customers' investments in financed and fully paid stored precious metal failed to appreciate enough during the relevant period to cover the costs associated with the investment and earn a profit.

72.     This failure to disclose prior customers' losses constituted a fraudulent omission in light of other statements made by Mintco regarding the financial benefits of investing in precious metal through Mintco.

73.     For instance, Mintco's website, on an introductory page titled "Welcome to Mintco", stated,"[w]e work hard to source and serve as many people as we can and put them on the road to prosperity."  It also stated, "[a]t Mintco, we specialize in helping investors diversify a percentage of their portfolio into hard assets such as gold, silver, and platinum, investment strategies *intended to maximize returns* through the outright purchase of or through financed programs." (Emphasis added).

74.     Furthermore, Mintco's September 2011 solicitation scripts used during customer calls informed customers, "[y]our Account Executive will work diligently with you to establish the *most beneficial Precious Metals portfolio* for your account." (Emphasis added).

75.     Additionally, Mintco stated in its introductory letter to customers that, "[b]ased on your investment objectives and sophistication, your Mintco Account Executive will assist you in determining the *best way to handle* your precious metals investment needs."

76.     Past performance of an investment program is material to a customer's decision to invest. A reasonable investor would want to know that over 80% of the retail customers' investments in stored precious metal failed to appreciate enough during the relevant period to cover the costs associated with the investment and earn a profit.

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I - Violation of Section 4(a) of the Act: Unlawful Off-Exchange Transactions with Respect to Financed Transactions

77.     Paragraphs 1 through 77 are realleged and incorporated herein by reference.

78.     Between July 16, 2011, and the present, Mintco, Rubin, and Zimmerman have offered to enter into, entered into, executed, confirmed, or conducted an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in agreements, contracts, or transactions in commodities (the "retail commodity transactions") on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis, with persons who are not eligible contract participants or eligible commercial entities as defined by the CEA, and who are not engaged in a line of business related to precious metals.

79.     Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii), the retail commodity transactions are subject to Section 4(a) of the CEA, 7 U.S.C. § 6(a), as if they are contracts of sale of a commodity for future delivery.

80.     The retail commodity transactions have not been made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market, were not conducted with non-ECPs, and were not delivered within 28 days.

81.     Mintco has therefore violated Section 4(a) of the CEA, 7 U.S.C. § 6(a), by offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order, or otherwise dealing in any transaction in, or in connection with retail commodity transactions, other than on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

82.     The acts, omissions, and failures of Rubin, Zimmerman, and other officials, agents, or persons acting for Mintco described in this Complaint have occurred within the scope of their employment, agency, or office with Mintco, and are deemed to be the acts, omissions, and failures of Mintco by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2.

83.     Rubin and Zimmerman have controlled Mintco and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Mintco's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Rubin and Zimmerman are, in addition to their direct liability, also liable for Mintco's violations of Section 4(a) of the CEA, 7 U.S.C. §6(a), as controlling persons.

84.     Each act of offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, retail commodity transactions, other than on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market, is alleged as a separate and distinct violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).

### COUNT II – Violation of Section 4d of the Act: Failure to Register with Respect to Financed Transactions

85.     Paragraphs 1 through 77 are realleged and incorporated herein by reference.

86.     The Dodd-Frank Act amended the definition of "futures commission merchant" in the CEA to include any individual, association, partnership, corporation, or trust that, among other things, is engaged in accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i).

87.     Between July 16, 2011 and the present, Mintco, through its agents and employees, accepted orders for agreements, contracts, or transactions described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i).

88.     Section 4d of the CEA, 7 U.S.C. § 6d, provides that it shall be unlawful for any person to be a futures commission merchant unless such person shall have registered with the Commission as a futures commission merchant.

89.     During the relevant period, Mintco has failed to register with the Commission as a futures commission merchant and has therefore violated Section 4d of the CEA, 7 U.S.C. § 6d.

90.     Rubin and Zimmerman have controlled Mintco and have not acted in good faith or have knowingly induced the acts constituting the violations of Mintco described in this Count. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b), Rubin and Zimmerman are therefore

liable as controlling persons for Mintco's violations of Section 4d(a)(1) of the Act, 7 U.S.C.
§ 6d.

### COUNT III – Violations of Sections 4b(a)(2)(A), (C) of the Act:
### Fraud by Material Misrepresentations and Omissions with Respect to Financed
### Transactions

91.     Paragraphs 1 through 77 are realleged and incorporated herein by reference.

92.     Sections 4b(a)(2)(A),(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C) (2012), makes it
unlawful for any person, in or in connection with any order to make, or the making of, any contract of
sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or
subject to the rules of a designated contract market, for or on behalf of any other person:  (A) to cheat
or defraud or attempt to cheat or defraud such other person; or (C) willfully to deceive or attempt to
deceive such other person by any means whatsoever in regard to any order or contract or the
disposition or execution of any order or contract, or in regard to any act of agency performed, with
respect to any order or contract for such other person.

93.     By making material misrepresentations and omissions to customers in connection with
the purchase or sale of financed transactions in precious metal, Defendants defrauded, and deceived
them in violation of Section 4b(a)(2)(A),(C).

94.     Each fraudulent or deceptive misrepresentation or omission made by Defendants
constitutes a separate and distinct violation of Section 4b(a)(2)(A),(C) of the Act.

95.     Rubin and Zimmerman have controlled Mintco and have not acted in good faith or
have knowingly induced the acts constituting the violations of Mintco described in this Count.
Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b), Rubin and Zimmerman are therefore liable as
controlling persons for Mintco's violations of Sections 4b(a)(2)(A), (C) of the Act, 7 U.S.C. §§
6b(a)(2)(A), (C).

96.     Furthermore, Mintco is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2014), as principal for the violative acts and omissions of Mintco's employees and agents, including Rubin and Zimmerman.

### COUNT IV – Violations of Section 6(c)(1) of the Act and Regulation 180.1(a): Fraud by Deceptive Device or Contrivance with Respect to Fully-Paid Transactions in Stored Metal

97.     Paragraphs 1 through 77 are realleged and incorporated herein by reference.

98.     Section 6(c)(1) of the Act, 7 U.S.C. §§ 9(1) (2012) provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

99.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2014) provides in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

100.    From July 2011 through the present date, Defendants used or employed deceptive devices or contrivances, in connection with a contract of sale of a commodity in interstate commerce, including, but not limited to:

(a)   Misrepresenting the nature of the relationship between Mintco and customers as one in which Mintco would be acting in customers' best interest as their agent or representative; and

(b)   Failing to disclose to customers that over eighty percent of customers' investments in stored precious metal failed to appreciate sufficiently to cover the associated costs of the investment and earn a profit.

101.   Defendant used the mails or other instrumentalities of interstate commerce by transmitting orders for retail commodity transactions over wires in interstate commerce.

102.   By this conduct, Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. §§ 9(1), and Regulation 180.1(a).

103.   Defendants directly engaged in these acts knowingly or with reckless disregard for the truth.

104.   Each deceptive device or contrivance used or employed including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act, 7 U.S.C. §§ 9(1) (2012), and Regulation 180.1(a) (2014).

105.   Rubin and Zimmerman have controlled Mintco and have not acted in good faith or have knowingly induced the acts constituting the violations of Mintco described in this Count. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b), Rubin and Zimmerman are therefore liable as controlling persons for Mintco's violations of Section 6(c)(1) of the Act, 7 U.S.C. §§ 9(1), and Regulation 180.1(a).

106.   Furthermore, Mintco is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2014), as principal for the violative acts and omissions of Mintco's employees and agents, including Rubin and Zimmerman.

## VIII.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l (2006), and pursuant to the Court's own equitable powers, enter:

a)       An order finding that Richard Q. Zimmerman, Stuart Rubin, and Mintco LLC violated Sections 4(a), 4d, 4b(a)(2)(A),(C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6d, 6b(a)(2)(A),(C), 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2014).

b)       An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with Defendants, including any successor thereof, from, directly or indirectly:

(i)       engaging in conduct in violation of Sections 4(a), 4d, 4b(a)(2)(A),(C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6d, 6b(a)(2)(A),(C), 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1 (2014);

(ii)      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § la (2012));

(iii)     entering into any transactions involving "commodity interests" (as that term is defined in Section 1.3(yy) of the Act), 7 U.S.C. § 1.3(yy) (2012)), for his own personal account or for any account in which he has a direct or indirect interest;

(iv)     having any commodity interests traded on his behalf;

(v)      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(vi)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

26

(vii)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014);

(viii)    acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2014)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014);

c)    An order directing Defendants, as well as any successors to Defendants, to pay restitution, pursuant to such procedure as the Court may order, to Defendants' victims;

d)    An order directing Defendants to pay a civil monetary penalty for each violation of the Act described herein, plus post-judgment interest, in the amount of the higher of: $140,000 per violation of the Act, or triple the monetary gain to Defendants for each violation of the Act and Regulations;

e)    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

f)    Such other and further relief as the Court deems proper.

Dated:  September 16, 2015                    Respectfully submitted,
                                        /s/Jon J. Kramer

                                        Jon J. Kramer
                                        Senior Trial Attorney
                                        Illinois ARDC # No. 6272560

Susan B. Padove
Senior Trial Attorney
Illinois ARDC No. #0341649

David Terrell
Chief Trial Attorney
Illinois ARDC No. # 6196293

Scott R. Williamson
Deputy Regional Counsel
Illinois ARDC No. # 06191293

Rosemary Hollinger
Regional Counsel
Illinois ARDC No. # 3123647


Attorneys for Plaintiff
Commodity Futures Trading Commission

525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0563 (Kramer)
(312) 596-0544 (Padove)
(312) 596-0546 (Terrell)
(312) 596-0560 (Williamson)
(312) 596-0520 (Hollinger)
(312) 596-0700 (office number)
(312) 596-0714 (facsimile)